Brockenbrough, J.
The principal difficulty in this case, arises from the fact, that the negroes, who are the subject of this suit, were declared to be slaves by the circuit court in a suit brought by them to recover their freedom against Erskine. He held them, I apprehend, under the will of mrs. Crouch, until they (the negroes) should arrive of age. I presume, he did not claim to hold them as his slaves for a longer period than the one I have mentioned. Mrs. Crouch held all the slaves given to her by M’Coy for her life only; and it would seem from the language of her will, that she supposed, that such as were bom after the death of M’Coy, and had not arrived of age at the period of her death, were her own slaves till they should come of age. She devised them for that limited period to Erskine, with directions to appropriate their hires during that time to his own proper use; and, I suppose, it was for that limited period he claimed them, when they sued him for their *193 freedom, claiming it not under the will of’ mrs. Crouch, but that of M' Coy.
I shall consider, 1. Whether, under M'Coy's will, they were free or not ? and 2. Whether, if they are free under that will, the. decision of the circuit court in the suit between them and Erslcine, is irrevocably binding, so as to make them slaves to the plaintiffs, who were not parties to that suit ?
1. Are they free or not ? Absolom M’ Coy, by his will, gave to Rebecca Crouch all his real and personal estate for her life, and at her death all his negroes to be free. And then he bequeathed, at the death of mrs. Crouch, to Thomas and George Falces all his personal estate, except his negroes which were then to be free and at full liberty. Thus, in the two clauses, giving first a life estate, and at the expiration thereof a remainder, he expressly bequeathed freedom to all his slaves, to take effect at the expiration of the life estate. Who were his slaves? Undoubtedly, not only those in being at the time of his own death, but the children of the females born during the life estate of mrs. Crouch. Those children were born slaves, because their mothers being then in a state of slavery, their children were in the same state. But they were slaves to the life tenant, only during her life, and no longer. Nor could they be slaves to the remaindermen at all, because the will expressly excludes all his negroes from being subjects of the gift in remainder. At the termination of the life estate, all his negroes were to be free ; but if those born during that life estate are excluded from the operation of the bequest, then all of his negroes will not be free, but some of them will still be slaves. It seems to me, that the right of the child to freedom is identical and cotemporaneous with that of the mother; and that when mrs. Crouch died, eo instanti the will of M' Coy operated to confer freedom on both. These propositions seem to me so plain as not to stand in need of authority; but if *194 they do, we have it in the case of Elder v. Elder’s ex'or. The decision of the court in the pauper suit between-these negroes and Erskine, was founded on the authority of Maria v. Surbaugh; but 1 do not think that the cases are alike. In that case, the testator William Holliday had bequeathed to a legatee, a female slave, who was to be free at the age of thirty-one years. She was a slave till thirty-one; and the court decided, that her children born before that period were in the same state as the mother, that is, were slaves; and there was nothing in the will to shew, that the testator intended to extend the bequest of freedom to them at the time the mother was to be free. But, in this case, the testator extended the bequest of freedom to all his slaves, born and to be born.
2. The great difficulty, as I have said, arises from the decision of the circuit court in the suit of the paupers against Erskine, which has never been reversed. It seems to me, that the paupers are not barred by that judgment, as against the plaintiffs in this suit, they not being parties in that suit. The obligatory character of a judgment or decree must be reciprocal. Suppose that the negroes in question had been slaves by the will, and the circuit court had erroneously decided in the suit brought by them against Erskine, that they were free. Such a judgment would not have been binding on the next of kin of T. Sf G. Fakes, they not being parties to the suit. They might have sued for and recovered them, into whose hands soever they might have fallen; or they might have taken peaceable possession of them, and in a suit for false imprisonment by the paupers against them, the previous judgment in favour of freedom, rendered in the suit against Erskine, would not have availed the negroes. As the next of kin of T. fy G. Fakes, in that state of the case, could not have been injured by a judgment between other parties, so neither can they be benefited by the judgment against the *195 paupers in their suit with ErsJcine. It may be, that if . . • the plaintiffs in this case had been parties to that suit, as well as ErsJcine, the circuit court might have decided differently. Those parties would have been in a belligerent attitude towards each other: it would have been the interest of ErsJcine to shew, that the FaJceses had no right, and vice versa: and from their contests the court might have discovered, that neither had a right, but that the negroes were free.
But it was argued, that as this is a case in which the negroes are not parties, they must be here looked on as property, having been declared to be slaves; and that all we have to do is to decide, which of the present parties has the best right to the properly. I do not think so. The plaintiffs are bound to shew, that they have a complete right; and if the defendant can shew, that the plaintiffs have no right, they cannot succeed, though the defendant defeats his own right. He has the possession, and must hold it against those who have no right.
It is proper that we should arrive at this result, to prevent circuity of actions. If the plaintiffs in this suit could recover possession of the negroes against ErsJcine, the negroes might immediately institute proceedings in forma pauperis against the present plaiutiffs, and as the former judgment would be no evidence against them, they would recover their freedom. We ought not to encourage this kind of litigation.
It has been said, that the rights of the negroes will be placed in jeopardy by this decision ; for as ErsJcine holds them, and has a decree in his favour, they can never recover their freedom against him. I do not know that such will be the result. The record of the suit for freedom is not before us, but from what can be gathered of its contents from the proceedings in this suit, I apprehend, that the only claim ErsJcine had against the negroes, was, that they were his property until they should arrive at the age of twenty-one, till which time, *196 under mrs. Crouch’s will, he was to hire them out, and apply the proceeds to his own proper use. The declaration of the court that they were slaves, seems to be an assertion of a mere abstract proposition, not applicable to the dispute then carrying on between the negroes and ErsJcine. ■ That declaration is not the decree of the court, but is the reason on which the decree is founded. If this be so, ErsJcine’s right over the negroes ceases as soon as they become of age.
But however this dispute may be settled as between them and ErsJcine, I am satisfied, that the plaintiffs have shewn no right to recover them as slaves; and therefore I am for reversing the decree, and dismissing the bill.
Tucker, P.
This case has been most learnedly and elaborately argued on many interesting points. According to my view of it, hewever, it lies within a narrow compass. The testator Absolom M’Coy, by the residuary clause in his will, bequeathed to Thomas and George Falces, after the death of mrs. Crouch, all his personal estate (except his negroes who were then to be free) to be equally divided between them. Here, it is first to be observed, that there was nothing left undisposed of, and if there were any of his negroes not free, they must go to the residuary legatees, and not to the next of kin; for it is clear, that every thing except-the emancipated negroes was to go to them. Secondly, the residuary clause having expressly excepted emancipated slaves from the residuum, the rights of the legatees are to be determined by the question, whether the slaves they claim title to were or were not free: if slaves, they belong to them : if free, they are excluded from the residuum, and therefore do not belong to them. The court, therefore, cannot decree without deciding whether the negroes claimed are free, since on that identical question depends the question whether they are included in the residuary clause.
*197 Now, as to this I have no doubt. The testator bequeathed all his slaves to mrs. Crouch for life, and at her death all of them to be free. Did the increase of the slaves belong to him ? Of this there can be no question. Who can doubt, that the slaves born after a testator’s death, in Virginia, constitute part of his estate, and are a part of the distributable subject after payment of debts ? Such things are of daily occurrence. It is probable, there is not a slave estate in Virginia, which is not increased by births between the testator’s death and distribution. Whose are they ? Part of his estate; for they are subject to his debts, before distributees or residuary legatees can claim them. Being his property, we must next inquire, whether this testator emancipated the increase by his will or not ? And here it must be observed, that the words are broad and general. He declares that at mrs. Crouch's death all his slaves shall be free. This includes the increase, unless we suppose, that he confined himself to the slaves then in being. But for this there seems no reason or motive. It is obvious that he designed to exonerate from slavery every one bound to him by that tie. Why exclude the increase ? I cannot perceive. Moreover, where the testator gives the mothers for life, with remainder over, the increase passes to the remainderman, though not named. Ellison v. Woody, 6 Munf. 368. And if a testator were to give all his slaves to A. that bequest would embrace those born after his death, not merely as accessory to their mothers, but substantively, and by virtue of the generality of the bequest. Accordingly, in Elder v. Elder's ex'or, it was expressly so decided. There, the testator, after devising freedom to Clara and her increase, declared it to be his will that “ the remaining part of his negroes" should be sent to Liberia; and these words were held to embrace, and effectually to emancipate, the increase. Judge Carr said, “ If these children were bom slaves, they were the *198 slaves of the testator, and come within the bequest, as well as their mothers.” Judge Cabell said, “I think the children born since the death of the testator are entitled to their freedom, equally with their mothers. If they were born slaves, they were the slaves of the testator, and passed by the will, to be sent to Liberia.” Judge Brooke concurred. I added, “ The increase were born slaves, as their mothers are yet slaves; but they fall as fully as their mothers, within the general expression ‘the rest of my negroes,’ and of course are equally the objects of the trust.” That case is decisive of the question here. The increase of M’ Coy’s female slaves were emancipated by his will; and if so, they did not pass to the plaintiffs as their property.
But it w'as objected, that by a final and irrevocable decision between the negroes and Erskine, they have been declared slaves, and that this court refused to allow a supersedeas to that judgment. Let me here express my deep regret at that refusal. It was anteriour to the case of Elder v. Elder’s ex’or, and was presented as a case decided upon the authority of Maria v. Surbaugh. No distinction was drawn in the petition, or even suggested, between the two cases; and, for my own part, I confess my mind did not take that direction in considering the subject. Considering Maria v. Surbaugh as unassailable, and looking to the paupers’ claim as being rested on their right to freedom because their mothers were free, I thought the case was not such as to justify the award of a supersedeas. I am now satisfied of the error, and if it were wdthin our power, I should heartily concur in the reversal of that judgment.
To return, however, to the case. It can have no influence here, either on the ground that it is res adjudicata, or on the ground of authority. The circuit superiour court very properly looked upon it as authority, and I think the judge was fully warranted in his decree in this case. But though authority for him,, it is not so *199 for us, when we see our error. Nor does it bind in this case, as res adjudícala. As ErsJdne could not use it against the plaintiffs, because they were not parties, so neither can they use it against him; for mutuality is the governing principle in such questions. The pauper suit is out of the question.
But it was said, if on this ground the legatees fail and their bill is dismissed, the decree will operate to give the negroes to ErsJdne, who may continue to hold them as slaves, because the verdict and judgment are conclusive that they are slaves. I think not—and, certainly, hope not. The dismissal of the plaintiffs’ bill upon the ground that the negroes are free, cannot have the effect of adjudging thorn to ErsJdne. It will leave them, indeed, in his possession, if he still has them; which seems at least doubtful, from the testimony taken upon the rule made some lime since in this cause; see Erskine v. Henry, 6 Leigh 378. But if he has the possession, I do not think the former judgment would be a bar to a new action: 1. because a new case may be made at law, by proof of assent of M’Coy’s executor, without proof of which they could not have succeeded in the former case; and 2. because ErsJdne having no pretence of ownership, the former action could not determine their rights; and if they could have had no benefit from its successful issue, they ought not to be affected by its unfavourable termination.
Cabell, J. concurred in the opinion of the president.
Decree reversed, and bill dismissed.